IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CATHERINE JONES | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 1358 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| CRACKER BARREL OLD COUNTRY STORE, INC. | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Before this Court is Defendant Cracker Barrel Old Country Stores West, Inc.'s[1] motion for summary judgment on plaintiff Catherine Jones' Americans with Disabilities Act claim. For the reasons stated in the opinion below, defendant's motion is denied.

**I.   FACTS**

The following facts are undisputed. Plaintiff Catherine Jones ("Jones") worked for defendant Cracker Barrel Old Country Stores West, Inc. ("CBOCS") from 1991 until her termination in May 2002. CBOCS is a corporation that operates restaurants and retail stores in Illinois and other states, including a restaurant and retail store location in Naperville, Illinois. In November 1994, Jones began working in CBOCS' Naperville restaurant and store, where she served as a server, retail employee, cashier, and hostess. At various times during her employment, Jones performed additional duties as a lead trainer and skill trainer under CBOCS'

---

[1] The defendant in this case has been inaccurately identified as Cracker Barrel Old Country Store, Inc. on the caption of the complaint. The correct name of the defendant is CBOCS West, Inc. This Court will refer to the defendant as CBOCS for brevity.

training programs. The skill trainer position was not a separate, discrete position, but rather a form of extra, job-related training that the designated employee performed in addition to her usual duties. On several occasions during Jones' employment with CBOCS, defendant promoted Jones through its Personal Achievement Responsibility ("PARS") program. During her decade of service with CBOCS, Jones was never disciplined or remanded and never received a less-than-satisfactory work evaluation.

From late 2000 until December 2001, Jones worked as a retail employee and, less often, as a cashier. Occasionally, she worked as a hostess in the store's restaurant area. At times, she served as lead trainer and skill trainer. Jones is diabetic and during her employment with CBOCS, her managers permitted her to take breaks or get something to eat or drink between normal break times when her diabetes so required. During the late summer or fall of 2001, Jones fell at work. On at least one occasion, an assistant manager at the store found her on her knees after a fall and inquired if she was all right. On December 3, 2001, Jones was diagnosed with multiple sclerosis ("MS"), a chronic, degenerative condition of the central nervous system. Jones informed her supervisors, including the Naperville store's General Manager, Pamela Ankrom ("Ankrom"), of her diagnosis in mid-December 2001. Also during December, Jones' doctor directed her to use a wheelchair. Jones has used a wheelchair at all times since December 2001.

On approximately December 14, 2001, Jones went on medical leave from CBOCS. Defendant provided Jones with Family and Medical Leave Act paperwork, which Jones signed. Jones's physician completed a Certification of Health Care Provider form as part of her medical leave paperwork, stating that Jones was incapacitated due to a serious health condition. He estimated her inability to work would last one to two months, and stated that the duration and

frequency of possible future periods of incapacity were unknown. Jones' doctor stated that Jones had been diagnosed with MS.

CBOCS's Family and Medical Leaves of Absence Policy provided in late 2001 and in 2002 that qualifying employees may be granted up to sixteen weeks of family and medical leave within a twelve-month period. CBOCS's Personal Leave Policy provided that qualifying full-time employees "may ask for an unpaid personal leave of absence for a period of up to 30 days....A maximum of two personal leaves may be granted in a 12-month period."

At this point, the parties' recollections of events begin to diverge dramatically. It is undisputed that Jones was on leave from CBOCS until May 10, 2002. During that time she continued to go into the restaurant at the Naperville location with her husband and sons to eat meals. Ankrom and other employees saw her in the restaurant between December 2001 and May 2002. Some employees remember seeing Jones in a wheelchair; others are not certain when they saw her in a wheelchair. On May 24, 2002, Jones states that she and her husband went to the Cracker Barrel restaurant and Jones asked to speak to Ankrom, who was at work that day. Jones and her husband waited ninety minutes but Ankrom did not come out to speak to them. Jones then paid for her meal with her employee discount card. She went home and called the store and asked for Ankrom. When Ankrom came on the line, Jones asked what the status of her leave was, whether she would be able to work, and whether she needed to complete any additional paperwork. Ankrom informed Jones that Jones had been "term[inat]ed from the system" on May 10, 2002, "because her leave of absence had expired."[2] Jones asked if she had been fired.

---

[2] CBOCS policy provides a two-week period between when an employment action is entered into the CBOCS computer system and when the action becomes final.

Ankrom told her that she had been terminated from the CBOCS computer system because her leave had run out but indicated that Jones was eligible for rehire. Ankrom stated that she had never asked Jones whether or when she was coming back to CBOCS because it was Jones' responsibility to notify Ankrom of her intentions.

In the days following her May 24, 2002 conversation with Ankrom, Jones attempted to contact the Human Resources department at Cracker Barrel's "home office" location in Tennessee. CBOCS policy is for the "home office" Human Resources department to send a written notice to an employee when it finds out that he or she has exhausted personal and/or medical leave and has had no communication with the store. She states that she left multiple messages for Brandi Beard, the Employee Relations Specialist in Human Resources at the "home office." Jones states she left a message asking what duties could be performed in a wheelchair and asking why she had been terminated. Jones testified that Beard never returned her call. In early June 2002, Jones received a letter from Beard, dated May 24, 2002, informing her that she had been terminated because she had exhausted all personal and FMLA leave.

After receiving the termination letter, Jones went to the Naperville store and spoke to Ankrom. Jones asked for copies of the written list of essential functions for the cashier position. Ankrom gave her the essential functions for all nine positions at CBOCS stores. Jones took the checklist to her physician, who drew a line through part or all of three listed functions.[3] Jones testified in her deposition that her physician drew lines through the job functions for which she

---

[3] The described functions that Jones's physician marked through were: (1) "lift a maximum of 20-pounds overhead for stocking merchandise"; (2) "move and climb a 2-step stepladder/stool and a 6-foot stepladder for cleaning, stocking, and guest assistance"; and (3) "must be able to lift, bend, and stoop." (Def.'s L.R. 56.1(a) Stmt., Ex. D, at CB00174)

needed an accommodation, such as a modified wheelchair. Jones's physician also drafted a letter that stated "[Jones] may return to work with the use of a modified wheelchair that would allow her to stand with support. She is capable of performing the responsibilities described in the job description provided to me in a safe and efficient manner." (Def.'s L.R. 56.1(a) Stmt., Ex. D, at CB00173).

Jones took her doctor's letter and the marked-on cashier position description back to the Naperville store and gave them to Ankrom. Jones states that she explained to Ankrom at that time that the markings on the cashier position description indicated that she could perform those tasks with a wheelchair or high stool. Jones asked Ankrom whether this was an accommodation CBOCS would make. Ankrom told Jones that the decision would have to come from the "home office." Jones testified that she believed Ankrom would submit the paperwork from her doctor to the "home office" for consideration as an accommodation. Ankrom admits that she did not ask Jones any further questions about her disability or about the paperwork from her doctor.

Brandi Beard, Employee Relations Specialist in CBOCS' "home office," states that she received the marked-up cashier position description, but does not remember ever receiving a letter from Jones' doctor in relation to Jones' request to return to work. Beard stated in her deposition that she did not consider Jones for re-employment. Beard further testified that if an employee is unable to perform even one of the written essential functions of the cashier position contained on the written checklist, that employee is neither qualified nor able to hold the position of cashier. CBOCS admits that reassigning or removing even one job function is not a reasonable accommodation under its standards. Beard did not know whether CBOCS could accommodate a wheelchair-bound individual in a cashier position. She stated that it was unlikely that someone in

a wheelchair could sweep and clean, or assist the retail manager in retail stocking and display, or lift twenty pounds overhead for stocking merchandise. Ankrom stated that either she or someone from the home office informed Jones that Jones would not be rehired if she could not perform the essential functions of the position. Jones testified that Ankrom told her there were no positions for Jones, and that Jones could not be a cashier because she could not bend and stoop. Jones asserts that she was never told that she would not be reconsidered for employment unless she submitted a new written application form.

### Disability Benefits

On December 4, 2002, Jones applied to the Social Security Administration ("SSA") for disability benefits. She applied for benefits by completing the SSA's form questionnaires. The forms did not ask whether Jones' disability prevented her from working even with a reasonable accommodation nor did the forms provide space to discuss possible accommodations. The questionnaire asked when the application became unable to work because of illness, disability, or injury. Jones wrote that she became unable to work on December 14, 2001. She stated that she stopped working because she was put in a wheelchair and she was unable to walk without falling. Jones received a form from SSA that stated, "This claimant meets 11.09A," the administrative rules governing who is eligible to receive Social Security Disability Insurance ("SSDI") benefits because she is both unemployed at the time of applying and has a form of multiple sclerosis that meets SSA's qualifying requirements.

### EEOC complaint

Jones filed a complaint of disability discrimination with the Illinois Department of Human Rights, which was simultaneously cross-filed with the EEOC, on August 12, 2002.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue of fact. Such a showing entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists only when a reasonable factfinder could find for the nonmoving party, based on the record as a whole. The court does not weigh the evidence and it does not make credibility determinations. Instead, the court makes all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000).

## III. ANALYSIS

### A. Estoppel

Defendant CBOCS asserts that Jones cannot withstand summary judgment because she applied for and received disability benefits from the Social Security Administration. CBOCS contends that the statements she made regarding her disability in that application should estop her from asserting that she is a qualified individual for the purposes of the ADA. Plaintiff, predictably, disagrees with CBOCS's interpretation; she asserts that the application process required her to complete standardized questionnaires that provided no room for discussion of whether she could work if granted a reasonable accommodation. Furthermore, Plaintiff cites Supreme Court case law that undercuts any bright line standard for estoppel based on a plaintiff's application for disability benefits under the SSA's administrative rules. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999).

The doctrine of judicial estoppel prevents a party "who has obtained a judgment on the basis of proving one set of facts from obtaining a second judgment by turning around and proving that the facts were actually the opposite of what he had proved in the prior case." *Reynolds v. City of Chicago*, 296 F.3d 524, 529 (7th Cir. 2002). The Seventh Circuit has applied judicial estoppel in cases where an ADA plaintiff had made a representation in a prior disability benefits application that appears to negate a required element of her ADA claim. *Lee v. City of Salem*, 259 F.3d 667, 674 (7th Cir. 2001). As defendant acknowledges, the Seventh Circuit's application of judicial estoppel is fact-specific and depends on the circumstances of each individual case. The Seventh Circuit requires an ADA plaintiff who has received disability benefits "to explain the apparent discrepancy with reference to the divergent definitions of disability set forth in the SSA and the ADA." *Lee*, 259 F.3d at 675 (citation omitted).

In *Lee*, the plaintiff failed to explain the discrepancy between his claims in his disability benefits application that he was totally disabled with his ADA claim. The plaintiff asserted that it had been "'hammered into [his] head' that he was disabled, and so he simply did the logical thing and applied for benefits." *Id.* The *Lee* court found this statement unsatisfactory, stating that the plaintiff's failure to resolve the discrepancy between his SSDI application and his ADA claim was fatal to his prima facie case because he could not show he was capable of performing the essential functions of his position.

In the instant case, CBOCS asserts that in her disability benefits application, Jones stated she had become "unable to work" on December 14, 2001, "because of" her MS. Accordingly, CBOCS contends Jones should be estopped from asserting that she was a "qualified individual" with a disability under the ADA at any point after December 14, 2001. Plaintiff argues that she

had sought to return to work at Cracker Barrel from December 2001 until she applied for disability benefits in December 2002. She asserts that she made repeated requests to return to work with a reasonable accommodation, that she made specific proposals regarding possible accommodations, but that CBOCS refused to meet with her or to discuss a return to work. Moreover, she states that in December 2002, when she applied for disability benefits, she used the form questionnaires the SSA provided and that the forms did not ask whether she would be able to work if she was provided with a reasonable accommodation. She contends that she informed SSA that she became unable to work on December 14, 2001, because that was the date on which Cracker Barrel–according to Jones–refused to allow her to work because she had been put in a wheelchair. Finally, plaintiff notes that the SSA administrative rules which govern who can receive disability benefits focus on whether an individual has a "severe impairment" that matches or exceeds those on a list of impairments. The disability benefits determination requires no further facts or representations. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999).

SSA does not consider the possibility of reasonable accommodation when it determines whether an individual is disabled. An applicant need not even discuss reasonable accommodation when applying for disability benefits. "Hence, an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." *Cleveland*, 526 U.S. at 804. This Court finds that Jones presented sufficient explanation of the disparity between her disability benefits application and her ADA claim to distinguish the instant case from *Lee*. The

SSA processes several million disability claims each year; it cannot engage in the kind of fact-specific and individual inquiry that is the hallmark of an ADA claim.

  B.  **The Americans With Disabilities Act**

    1.  **"Qualified Individual" With Disability and Essential Job Functions**

Under the ADA, a plaintiff claiming disability discrimination must prove that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position" in question. 42 U.S.C. § 12111(8). CBOCS argues that Jones's ADA claim must fail because she cannot show that she is a "qualified individual" with a disability. Specifically, CBOCS contends that Jones is not qualified to perform any of the nine positions or the employee training coordinator ("ETC") role in its stores because she cannot perform all the tasks listed on its printed "essential functions" checklist for each position. CBOCS states that the essential functions of the cashier position include lifting no more than twenty pounds overhead when stocking merchandise; moving and climbing a two-step stepladder and a six-foot stepladder for cleaning, stocking, and guest assistance; and being able to lift, bend and stoop. It asserts that Jones is unable to perform these functions with or without a reasonable accommodation and has been unable to do so since December 2001.[4] In addition, CBOCS states that the lead trainer and ETC positions were not stand-alone positions but rather a set of responsibilities that an employee took on in addition to the essential functions of her role as one of the nine discrete hourly positions.

---

  [4] CBOCS lists the functions of the other hourly positions which it alleges are essential and which it contends Jones cannot perform. This Court sees no value in listing each function individually. The position about which the parties principally disagree is the cashier position.

Jones, as might be expected, disagrees with CBOCS on almost every point. In particular, Jones contends that the "essential functions" CBOCS provides on its written checklists are not, in fact, essential functions of the nine hourly positions. Essential functions are the "fundamental job duties of the employment position." 29 C.F.R. §1630.2(n)(1). The term "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see also Kohnke v. Delta Air Lines, Inc.*, 1995 WL 505973, at *3 (N.D. Ill. Aug. 23, 1995).

When determining the essential functions of a position, the court shall consider the employer's judgment as to what are essential functions. Written job descriptions prepared by the employer are evidence of that judgment. 42 U.S.C. § 12111(8). The court also makes an individualized factual assessment of the job at issue. *School Bd. of Nassau County v. Arline*, 480 U.S. 287 (1987). The court should consider not only the written job description, but also the amount of time spent on a task, the experience of past employees in the position, and the consequences of not requiring the employee to perform the function. 26 C.F.R. § 1630.2(n)(3).

The record presented in this case suggests that there is genuine material dispute about what the essential functions of the various positions at CBOCS are, much less about whether Jones was capable of performing them with or without a reasonable accommodation. Jones asserts that she was not required to climb a stepladder or ladder, lift twenty pounds overhead, among other things. She admits that other cashiers sometimes did those things, but contends that she would be able to accomplish the tasks with a reasonable accommodation. In addition, she provides evidence from her direct supervisor that several of CBOCS's written essential functions were not required of cashier's. In addition, even assuming that all the written functions were essential, Jones disputes CBOCS's contention that she could not perform them with or without a

reasonable accommodation. Jones further argues that CBOCS mischaracterized a letter from her doctor as illustrating that she was not a qualified individual. Instead, Jones states that she discussed her doctor's letter and his markings on the CBOCS list of "essential functions" for the cashier position with Ankrom, telling Ankrom that her doctor had marked out the functions that she could not perform unless she was in a wheelchair. Because this court draws all reasonable inferences in favor of the non-moving party when deciding a motion for summary judgment and because plaintiff has provided a reasonable explanation of her ability to perform the essential functions of at least one position at CBOCS, this Court finds summary judgment is inappropriate.

### 2. Disparate Treatment

CBOCS argues that, even if Jones is a qualified individual with a disability, it is still entitled to summary judgment on Jones' disparate treatment claim. In its view, Jones is unable to establish a prima facie showing of disability discrimination.

A plaintiff alleging disability discrimination under the ADA may proceed under either the direct or the indirect method of proof. As with Title VII claims, there are two acceptable forms of evidence under the direct method: direct evidence and circumstantial evidence. Direct evidence is essentially an admission by the employer that its decisions were based on discriminatory animus. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence, by contrast, permits a fact-finder "to infer intentional discrimination by the decision-maker." *Id*.

The plaintiff may also choose to proceed under the indirect method, which requires her to establish a prima facie case of discrimination. To make her prima facie case, the plaintiff must

show that (1) she was disabled under the ADA; (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) she has suffered from an adverse employment action because of her disability. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (citation omitted). If the plaintiff establishes a prima facie case of disability discrimination, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action against Chen. *Id.*; *Dvorak v. Mostardi Platt, Inc.*, 289 F.3d 479, 485 (7th Cir. 2002). At that point, the burden would shift back to plaintiff who would be required to show by a preponderance of the evidence that the defendant's proffered nondiscriminatory reason is a mere pretext for intentional disability discrimination. *Buie*, 366 F.3d at 503.

CBOCS argues that Jones cannot produce sufficient direct, circumstantial evidence that "directly points to a discriminatory intent." *Davis v. Con-Way Transp. Cent. Exp.*, 368 F.3d 776, 786 (7th Cir. 2004). It contends that the evidence Jones offers have no temporal proximity to the employment decision in question. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003). Jones disagrees and contends that she has provided sufficient evidence to create a "mosaic" of circumstantial evidence that directly points to discriminatory intent.

Jones offers evidence that when she told the general manager of the Naperville store, Pamela Ankrom, that she had been diagnosed with MS and needed to use a wheelchair, Ankrom responded that CBOCS couldn't have Jones there, "falling all over the place." That same day, Ankrom gave Jones paperwork for FMLA leave, effectively refusing to consider Jones' accommodation request. Jones also testified that Ankrom discussed concerns that Jones would fall down at work and sue CBOCS with other managers in late 2001 and early 2002. During her

efforts to discuss possible accommodations with CBOCS, Jones talked with the former gift shop manager of the Naperville store, who told Jones that she had decided against hiring applicants in wheelchairs because the wheelchair would "just get in the way." This Court finds that a reasonable factfinder could infer that CBOCS discriminated against Jones because of her disability. Summary judgment is therefore inappropriate.

Assuming *arguendo* that Jones had been unable to produce direct evidence of discrimination, she could still proceed under the indirect method. CBOCS argues, again, that Jones is incapable of making a prima facie case because she cannot show that she was treated differently from a similarly situated employee who was not disabled. Predictably, Jones disagrees and argues that CBOCS has applied the wrong test.

Under Seventh Circuit law, however, a plaintiff alleging discrimination under the ADA is not required to show that she was treated differently from a similarly situated employee. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996); *Leffel v. Valley Fin. Svcs.*, 113 F.3d 787, 794 (7th Cir. 1997). In the instant case, it is undisputed that Jones suffers from MS and is therefore disabled under the ADA. Whether she was qualified to perform the essential functions of the position is disputed, as discussed above, but this Court has found that a reasonable factfinder could determine that she was so qualified. Jones has suffered an adverse employment action because CBOCS terminated her from her position.

The burden therefore shifts to CBOCS to articulate a legitimate, nondiscriminatory reason for terminating Jones. CBOCS asserts that Jones used up all of her available medical and personal leave and then did not follow CBOCS procedure and report or return to work thereafter.

Jones, however, disputes this. She argues that CBOCS' medical and personal leave policies are not as clearly defined as CBOCS states, and that she was, in fact, terminated before her leave expired. Furthermore, she contends that she made repeated efforts to return to work, but that CBOCS representatives would not meet with her in person or take her phone calls. CBOCS notes that "if parties could resist summary judgment merely by saying, 'No, that's not so,' 'I disagree with that,' or 'I have my own interpretation of your policy,' summary judgment could never be rendered." (Def.'s Reply Br. at 11). However, when both parties engage in a battle of excerpts from deposition testimony and file affidavits consisting of little more than "Everything the opposing party said is false," a reasonable inference is that there remain genuine issues of disputed material fact. This case falls into that category.

CBOCS's Personal Leave policy states "You may ask for an unpaid personal leave of absence for a period of up to 30 days if you are a full-time or part-time employee, and you have completed three months of continuous service. . . .A maximum of two (2) personal leaves may be granted in a 12-month period." (Ex. C of Def.'s L.R.56.1(a) App. at CB00264). CBOCS contends that this means that an employee make take no more than 30 days of personal leave in a 12-month period. Jones argues that the wording suggests that up to two separate 30-day personal leaves of absence are permitted. This Court finds that the wording is sufficiently ambiguous that a reasonable factfinder could agree with Jones' interpretation. If so, then CBOCS's reason for terminating Jones is not legitimate. Summary judgment therefore is inappropriate.

### 3. Reasonable Accommodation

To make a prima facie case for failure to reasonably accommodate, plaintiff must show that (1) she was disabled; (2) her employer was aware of her disability; and (3) she was a

qualified individual with a disability who, with or without reasonable accommodation, could perform the essential functions of the position. *McPhaul v. Bd of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000). A plaintiff is entitled only to a reasonable accommodation, not to the accommodation of her choice. *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344-45 (7th Cir. 1996). A reasonable accommodation is one which permits the plaintiff to perform all the essential functions of her job. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). An employer is not required "to modify, reduce or reallocate the essential functions of a job..." *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 485 (7th Cir. 2002). However, once an employee informs her employer of her legitimate disability, the employer is obligated to provide a reasonable accommodation. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996). The employer must engage with the employee in an "interactive process" to determine whether there is an accommodation that would permit the employee to continue working. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998); *Bombard v. Fort Wayne Newspapers, Inc.* 92 F.3d 560 (7th Cir. 1996). The plaintiff, however, must show "that exists a vacant position for which she was qualified." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001).

The parties in this case disagree about whether Jones sought to discuss a reasonable accommodation. CBOCS contends that Jones was unable to perform all the listed "essential functions" of any of its positions and that there was no possible reasonable accommodation which would enable her to perform them. Jones disagrees and asserts that she attempted to propose accommodations, such as using high stool when working as a cashier or using a supportive wheelchair, among others, but that CBOCS refused to discuss her proposals. The

parties also disagree about whether there existed a vacant position for which Jones was qualifies. CBOCS says there was none; Jones asserts there was at least one and possibly more. The determination of which party to believe turns on issues of credibility, which are inappropriate for a court to resolve at the summary judgment stage of the proceedings.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **March 11, 2005**